# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *In re Marriage of Betsy M.*, 2015 IL App (1st) 151358

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF BETSY M., Petitioner-Appellee, and JOHN M., Respondent-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-1358 |
| Filed | December 17, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-D-12180; the Hon. David Haracz, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Paul J. Bargiel, of Paul J. Bargiel, P.C., and Glen Kaufman, both of Chicago, for appellant.<br><br>Karen A. Altman, of Riewer & Collins, LLC, of Lake Forest, and Michael W. Rathsack, of Law Office of Michael W. Rathsack, of Chicago, for appellee. |
| Panel | JUSTICE HOWSE delivered the judgment of the court, with opinion.<br>Presiding Justice McBride and Justice Ellis concurred in the judgment and opinion. |

## OPINION

¶ 1      On October 29, 2013, during the pendency of the petition for dissolution of marriage filed by petitioner Betsy M. against respondent John M., the parties entered into a stipulated custody judgment. The custody judgment gave Betsy sole custody of the parties' three minor children and provided restricted visitation for John. On June 2, 2014, John filed a "Motion to Increase And/Or Modify Parenting Time," and on February 9, 2015, the trial court granted the motion in part by increasing John's hours of visitation from one hour to three hours every other week, and denied the motion in part by ordering that all other parenting agreements as laid out in the October 29, 2013 order remain the same. John filed a motion to reconsider the February 9, 2015 order, and the trial court denied that motion on April 17, 2015. John filed a notice of appeal on May 14, 2015 from the February 9, 2015 and April 17, 2015 orders. On May 22, 2015, John filed an amended notice of appeal from those two orders, adding a reference to Illinois Supreme Court Rule 311 (eff. Feb. 26, 2010), which governs expedited appeals in custody and visitation matters. For the reasons that follow, we affirm the trial court's orders.

¶ 2                                    BACKGROUND

¶ 3      Petitioner Betsy M. and respondent John M. are the parents of three minor children, Hunter, age 16; Hayden, age 14; and Sally, age 10. On October 29, 2013, the trial court entered a custody judgment which incorporated a parenting agreement agreed upon by the parties. The custody judgment granted Betsy sole custody of all three children. John was given visitation rights with the minor children for brunch every other Sunday. Those visits were to be in the presence of Pat Anderson, who was to serve as an "extra set of hands *** for the foreseeable future and until otherwise agreed upon by the parties." John was also entitled to take tennis lessons with Sally twice per month at MidTown Tennis Club, and those lessons were to be scheduled by the child representative. The custody judgment also laid out a "Path to Increased Parenting Time" based on counseling. Specifically, it stated that Carroll Cradock, Ph.D., "will be the therapist to assist in reconciliation between the children and their father." Prior to the entry of the custody judgment on October 29, 2013, John had not seen his children since April 2013. On January 9, 2014, a judgment for dissolution of marriage was entered in the case that dissolved the parties' marriage and settled all related matters. However, the second to last paragraph of the judgment provides: "Except for the custody judgment incorporating the parent agreement; all court orders entered during the pendency of this matter are hereby vacated and held for naught."

¶ 4      On April 14, 2014, John filed a petition to enforce the custody judgment alleging that the child representative had not scheduled tennis lessons with Sally despite the fact that John had provided information regarding his choice of tennis instructors.

¶ 5      On June 2, 2014, John filed a "Motion to Increase And/Or Modify Parenting Time." In that motion, John argued that he is entitled to more visitation under section 607(a) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/607(a) (West 2012)) where: he has been exercising every visit to which he is entitled since March 2014; the limited amount of visitation time he has does not allow him to take his children to a movie, a museum, a play, a ballgame, etc.; and he is not physically or psychologically a danger to his children. John proposed in the motion that he be given 12 hours of visitation on alternating

Saturdays and Sundays and, thereafter, alternate weekend visitation from Friday after school until Sunday at 5 p.m. John then concluded his motion by stating: "There is a substantial change in circumstance in that JOHN is consistently visiting with his children which was not the circumstance at the time of the entry of the custody judgment."

¶ 6    On July 8, 2014, Betsy filed her response to John's "Motion to Increase And/Or Modify Parenting Time" alleging that the increase was not in the children's best interests, that John has not sought the assistance of a family therapist to facilitate his relationship with the children, and that increased visitation will be detrimental to his children because they have not had any positive experience with John since visitation commenced in March 2014.

¶ 7    On July 17, 2014, Betsy filed a "Petition for Appointment of a Rule 604(b) Professional" requesting that Dr. Palen be appointed as a 604(b) evaluator in the case to make recommendations to the court regarding the issue of John's visitation.

¶ 8    On July 23, 2014, the trial court entered an order setting John's "Motion to Increase And/Or Modify Parenting Time" for trial and directed Dr. Palen to conduct "a limited 604(b) evaluation on the sole issue as to whether increased parenting time for John *** serves the children's best interest." There is no indication in the record that John made any objection to this order.

¶ 9    Trial commenced on January 7, 2015. Dr. Michael Stone, a clinical psychologist, testified that he first met with John on January 30, 2014. At that time, John was experiencing emotional distress, particularly depression and anxiety, because he had not been able to connect and have a relationship with his children. After conducting two or three sessions of diagnostic evaluations, Dr. Stone began treating John. As of the date of his testimony, Dr. Stone had been seeing John once a week for approximately one year. Dr. Stone testified that John suffers from depression, anxiety and attention deficit disorder (ADD) for which he takes Cymbalta, an antidepressant, and Adderall. Dr. Stone testified that John's goals are to manage his time effectively and follow through, learning relaxation and autogenic training, and successfully managing his personal and social behavior to have a more successful and productive relationship with his children. Dr. Stone testified that John is cooperative and forthcoming with information, he has no suicidal ideations, his emotional problems are in the area of normal adjustment, which are not dangerous or cause for concern, and his mental health is stable. With respect to his relationship with his children, Dr. Stone stated that the relationship was "problematic" and that "[t]here's been a period of separation, and not unusual in these types of cases, they're angry, withholding, and not overly responsive to him." Dr. Stone's recommendation for improving this relationship is to be patient and consistent because "in these situations over time when they see his sincerity and consistency he should have a more successful relationship."

¶ 10    Dr. Stone testified that he believes John is capable of managing increased visitation and that it is possible, "in a step-wise way," for him to eventually manage overnight visitation, after 60 to 90 days of increased autonomous visits. Dr. Stone does not believe that John's mental health would interfere with John's ability to care for his children, and he does not believe that John is a danger to his children. John has told Dr. Stone that he believes his children's negative views of him come "somewhat" from Betsy's negative view of him. Dr. Stone testified that he would like to meet John's children because he believes he could help to facilitate their relationship with John.

¶ 11    Dr. Stone testified that John takes some responsibility for the relationship with his children, and he acknowledges that the children witnessed his depression when he was not as functional and far from his best. John would like to be included in more of the children's activities, but often times he is not included. Dr. Stone has not met any of the children. Dr. Stone stated that if extended visitation were to begin, he could not say whether John's home was suitable for that as he has not seen the home. Dr. Stone stated that he could not say with accuracy whether increased visitations would be successful for the children until he has had a chance to sit down with them.

¶ 12    Dr. Stone testified that John wants to be a part of his children's lives and he loves them very much. Dr. Stone does not consider John a danger to himself or others, especially his children. While John is anxious about his visits with the children, Dr. Stone did not observe any debilitating anxiety or depression that would reduce John's functional capacity. Dr. Stone stated that John has experienced a level of rejection based upon the way the visits are going. The minimal interaction between John and the children has been slow going, which Dr. Stone does not believe is "unusual in a situation like this." If the visit structure were up to him, Dr. Stone would have individual visits because the idea of visiting three children supervised for an hour does not "allow for relaxed connection."

¶ 13    Dr. Stone stated that John is in touch with reality and is not clinically depressed. His "ability to problem solve, his energy level are all at significantly improved and heightened level." Dr. Stone stated that John has stated that sometimes it is nice to have a facilitator at visits since it can help break the ice and gives himself or the children someone else to talk to. Dr. Stone stated that John is willing to communicate with Betsy in order to facilitate visitation. Dr. Stone has no problem recommending an increase in visitation even if the children are not receptive at first. He believes that the need for a facilitator should decrease over time and the quality of the visits should improve over time.

¶ 14    Dr. John Palen, a clinical social worker, testified that he has been conducting custody evaluations since 1995, has conducted over 200 of them in that time frame, and that he was appointed to conduct a custody evaluation in this matter in December 2012 and December 2014. The purpose of the December 2014 evaluation was to give an opinion as to whether increased visitation was in the best interests of John and Betsy's children. There is no indication in the record that John objected to Dr. Palen's appointment.

¶ 15    Dr. Palen testified that in 2012, John had a strained relationship with his children; they did not want to spend time with him, and their resistance intensified between 2012 and 2014. It was Dr. Palen's understanding that John was uncomfortable at visitation, and there was very little communication between the children and John at the visitations. Prior to March 2014 when John began the visits, there was an 11-month period where John was absent from his children's lives, during which time John did not attempt to contact them or acknowledge holidays or birthdays. The only attempts to reestablish any connection with his children during that time was when John hung photos of his children in his windows facing Wells Street so that the children could see the photos as they walked or drove by. John also hung a business card from the children's uncle's law firm in the window. The photo of Hayden was described by Hayden as distorted, so that his head appears elongated and creepy. John told Dr. Palen that he hung the photos because he thought it was the only way to communicate with his children during that time, yet John did have the children's cell phone numbers and email addresses during that time. Based on his review of a neuropsychological evaluation

report of John done by Dr. Ganellen in 2012, John has "a limited capacity to observe his behavior and his emotions and when feeling strong emotions isn't aware of their existence and acts in a manner inconsistent with how he's feeling internally which causes confusion around those–in the people he's interacting with."

¶ 16    In 2014, Dr. Palen met with John for about 90 minutes and then observed John with his children for about 90 minutes. Dr. Palen does not believe that it would be beneficial at this time to increase visitation between John and his children. John's son, Hunter, was vocal about his anger toward John; John's daughter, Sally, wanted to know what John was doing on a daily basis so she could picture him; and John's son, Hayden, harbors a longing for contact and a relationship with his father. At the visits, Hunter is overtly angry at John, and Hayden and Sally essentially ignore him. Dr. Palen testified that Sally experiences a high level of stress over the visits.

¶ 17    Dr. Palen testified that it is difficult to predict a time frame for increasing parenting time. Family therapy did not improve John's relationship with the children. Dr. Palen does not believe that John accurately perceives reality at all times, largely because he blames Betsy and the nanny for the children's level of estrangement from him and does not take any responsibility himself.

¶ 18    Dr. Palen stated that John does not harbor any ill will toward his children, he is exceedingly patient with them, he is not physically or verbally a threat to his children, and one of the reasons the children resent the current visitation schedule is because it interferes with other activities. Dr. Palen indicated that he doubts Betsy is sincere when she tells the children to be kind to their father, and there is no indication that Betsy genuinely feels that learning how to interact with their father is important.

¶ 19    The visitation supervisor, Marcia Miles, told Dr. Palen that Betsy asked her not to remind John about his visits with the children and that she would still get paid if he did not appear for a visit. John informed Dr. Palen that he feels like he is in a catch-22–if he attends the children's activities, the children are uncomfortable, but if he does not attend, he is criticized for not attending. Hayden informed Dr. Palen that their mother makes them show up for visitations because if they do not, it makes her look bad. He further stated that he misses out on activities with friends when he had to go to visit his father. Sally is doing well and showed no signs of anxiety or depression. Sally told Dr. Palen that her mother describes her father as being kind of crazy.

¶ 20    The visitation supervisor also told Dr. Palen that the children came to visitation with the mindset that it would be terrible and they had no hope that the quality of the visits would improve, which negativity emanates in part from Betsy. It is Dr. Palen's opinion that Betsy is obsessive, often holds herself and her children to a nearly unrealistic standard, and overreacts to each and every error they make, no matter how inconsequential the error may be.

¶ 21    Dr. Palen opined that the family therapist, Miss Bowkers, informed her that the children notice the differences in their parents' lives and have determined that John's way of living is inadequate. Bowkers also informed him that John always seemed excited about his kids, eager to help, and never showed resentment or anger toward them. Although Betsy may not speak highly of John in front of the children, John does not speak negatively about Betsy in front of the children.

¶ 22    Dr. Palen believes that family therapy, with the children, John, and to some extent Betsy, would be helpful. It is Dr. Palen's opinion that the children will be very resistant to increased

parenting time with John. As of 2014, he does not believe that John understands why the children are resistant to spending time with him.

¶ 23      Betsy was then called to testify. She testified that she agreed to the parenting agreement that was incorporated into the custody judgment following the divorce. She further testified that the children do not have any disciplinary problems at school, they do not have any physical ailments; their sleep habits are normal, her relationship with her children is good, the children do what she asks them to do, they are well behaved; they go to bed and wake up when they need to, and they rarely miss school. She testified that none of the children are on any anti-depressant medication and none have any problems with the law. As for extracurricular activities, both boys are involved in boy scouts, volleyball and soccer; Sally is involved in cross country, ballet, horseback riding and basketball; Sally and Hayden take swimming; all the children take piano and guitar lessons; and all of the children took ballroom dancing a year ago. Sally is involved in a tutoring program, and Hayden does Science Olympiad.

¶ 24      A few days before visitation, Sally will ask about the visitation, will ask Betsy to cancel it, will become withdrawn, and will get a stomach ache as the visit gets closer. After the visitation, Sally seems relieved and it takes about three to four hours for her to be back to her normal self. Betsy's discussions with Hayden typically center around avoiding the visits, and Hunter appears angry about visits.

¶ 25      On April 14, 2014, John came to the boys' Science Olympiad competition and left without communicating with the boys. Betsy believes that the current visitation schedule is a sound one. If the children are having a good time, the visitation could be extended. She wants John and the children to have a relationship.

¶ 26      Betsy stated that she was facilitating the relationship when she told the supervisor not to remind John of his visits and that when she made these comments to the supervisor, she was only conveying a message from the child representative. Betsy does not think John should be able to visit the children on Christmas or Easter, and she does not think the tennis lessons with Sally should continue.

¶ 27      John was then called to testify. He testified that he is 55 years old and he is not employed. He testified that Sally is in fourth grade at Sacred Heart in Edgewater, Hunter is in tenth grade at the Latin School on the north side, and Hayden is in seventh grade at Sacred Heart. His current visitation schedule is every other Monday for one hour with all three children and tennis with Sally every other week, which is to be scheduled by the child representative. The visits were originally on Sundays for brunch, but Betsy had to change the day to Monday. The first visitation was in March 2014, and a supervisor, Marcia Miles, is present for the visitation sessions. During the visits, there is very little conversation, and the boys are often on their cell phones most of the time. John testified that he went to three or four tennis lessons with Sally, where the nanny would also be present, but the child representative did not schedule any lessons after that. John has not spent any holidays or vacation time with his children since he moved out in 2012, and he has not been able to take them to church or spend any extended time with them since he moved out. He has not spoken with the children on the phone since before the custody judgment was entered. John has not gone to any of the children's activities since the divorce, because he said they do not want him there and are not comfortable with him there.

¶ 28    Currently, John lives in a two-bedroom apartment, which John states is not suitable for overnight visitation, but he testified that he could get something that was suitable within a few days. John owns a car, has a valid driver's license and auto insurance. John is currently seeing a therapist for depression and anxiety and is taking Cymbalta and Adderall for those conditions. If he were granted overnight visits, John testified that he would be able and willing to prepare meals for the children, get them to and from school in a timely fashion, help them with homework, and make sure they attend all of their activities. He believes that overnight stays would strengthen his relationship with the children because it would give them more of a chance to be together and him a chance to advise them and get involved in their daily activities.

¶ 29    John stated that he put the pictures in his window during the Old Town Arts festival and that the pictures were drawings made by his children and photos of his children. Hayden complained about the photo of him, but John had already taken everything down at that point. The pictures were left in the window for approximately a year. John also put a sign in the window that said MPS law, or something to that effect, which would be Betsy's brother's law firm. At one point, he also had a little poster of how to make a Reuben sandwich and a sign that stated "a cat needs a friend" in the window, but those were not there for his children.

¶ 30    Besides sending Sally a text message on her sixth birthday in 2015, John did not or could not remember if he acknowledged the children's birthdays since the divorce. John has not initiated any contact with Betsy since the entry of the custody judgment. At the time the custody judgment was entered, John was not specifically aware of all the activities that the children were involved in. John currently does not have a functioning television.

¶ 31    John testified that when he was in the house through March 2012, he was depressed and living in the basement and was not the best role model for his children. John learned from Dr. Palen that Sally had shown up for one of her tennis lessons, but John was not there. John does not believe that a supervisor for visitation has helped but does believe that Marcia Miles is a good one. At visitation, Hunter shows anger toward John, and John lets him get it out, even if it is in front of the other children. John has not discussed his mental health with his children. He also has not discussed why he is currently seeking an increased visitation schedule with them.

¶ 32    Hunter, John and Betsy's 16-year-old son, testified that he lives with his mother, Hayden and Sally. He is a sophomore at Latin school. His grades are good, and he plays soccer and volleyball. He goes to school between 7:30 and 8:25 in the morning and gets out of school at 3:20 in the afternoon. His mother usually gets home around 6:30 or 7:30 in the evening, and they have a "sitter" to help with dinner.

¶ 33    Hunter saw John the day before at a Water Tower restaurant with Hayden, Sally and a supervisor named Juanita. They ordered food and did not talk much; John did not ask any questions. Hunter said that one hour is enough, and he does not have any desire to stay longer than that. The visits have never been comfortable and have been tolerable at most. He never feels unsafe with his father, but he does not want to spend more time with him. He does not think that John would be able to adequately parent his younger siblings. Hunter would be more comfortable if he knew when his father was going to attend a school function, but the same goes for his mother in that situation.

¶ 34    Katie Augustyn testified that she is a licensed clinical social worker who provides psychotherapy to children, adults and family members. She began seeing Sally and Hunter on April 8, 2012 because Sally was having difficulty coping with her parents' divorce. Sally had anxiety symptoms that go up and down and are centered around visits with her father. There was a significant decrease in her symptoms during the summer of 2013 when she did not meet with her father.

¶ 35    Sally's relationship with her father is strained, difficult and fearful. She is not afraid that he will hurt her, she is just afraid of seeing him. Sally said that the supervisor helps her deal with her anxiety. Dr. Augustyn stated that with time and support, Sally can come to have a greater understanding and compassion for her father.

¶ 36    On February 9, 2015, the trial court entered an order increasing John's visitation time to three hours per visit facilitated by an "extra pair of hands" until at least the next court date and until the parent coordinator is in place.

¶ 37    On February 19, 2015, John filed a "Motion to Reconsider and/or Clarify" the February 9, 2015 order. On March 9, 2015, John filed the amended motion to reconsider the February 9, 2015 order, arguing that his visitation should not be restricted where he is not a danger to his children, Betsy stands in the way of having productive visitation, and he has the right to pursue a new visitation schedule since that right that was reserved in the custody judgment.

¶ 38    On April 17, 2015, the trial court entered an order denying John's amended motion to reconsider the February 9, 2015 order. The April 17, 2015 order included language that there was no just reason to delay enforcement or appeal of the February 9, 2015 order and the order was final and appealable.

¶ 39    John filed a notice of appeal on May 14, 2015 as to the February 9, 2015 and April 17, 2015 orders. On May 22, 2015, John filed an amended notice of appeal relating to those two orders and added a reference to Illinois Supreme Court Rule 311 (eff. Feb. 26, 2010), which governs expedited appeals in custody and visitation matters. For the reasons that follow, we affirm the trial court's orders.

¶ 40                                    ANALYSIS
¶ 41                                    Jurisdiction
¶ 42    Betsy argues that this court does not have jurisdiction to hear John's appeal because neither the February 9, 2015 nor the April 17, 2015 orders were final and appealable since both orders were entered in the context of the October 29, 2013 custody judgment wherein the parties agreed that the parenting agreement would evolve incrementally. Betsy further notes that the trial court's orders on February 9, 2015 and April 17, 2015 were not final and appealable because they did not finally conclude issues between the parties but rather made adjustments in the parenting agreement.

¶ 43    On April 17, 2015, the trial court entered an order denying John's motion to reconsider the court's February 9, 2015 order. The February 9, 2015 order granted in part and denied in part John's "Motion to Increase And/Or Modify Parenting Time." The April 17, 2015 order states that: "There is no just reason to delay the enforcement or appeal or both of the February 9, 2015 order and said order is final and appealable." John filed a notice of appeal as to both the February 9, 2015 and April 17, 2015 orders on May 14, 2015.

¶ 44    We find that we have jurisdiction to hear John's appeal because it is an order which modifies custody of the minor children. The February 9, 2015 and April 17, 2015 orders could also be appealed pursuant to Illinois Supreme Court Rule 304(b)(6) (eff. Feb. 26, 2010), which allows an appeal where "[a] custody judgment is entered pursuant to the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.*) or section 14 of the Illinois Parentage Act of 1984 (750 ILCS 45/14); or *a modification of custody entered pursuant to section 610 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/610) or section 16 of the Illinois Parentage Act of 1984 (750 ILCS 45/16)*" (emphasis added) or Illinois Supreme Court Rule 306(a)(5) (eff. Feb. 16, 2011), which states "[a] party may petition for leave to appeal to the Appellate Court from the following orders of the trial court: *** from interlocutory orders affecting the care and custody of unemancipated minors, if the appeal of such orders is not otherwise specifically provided for elsewhere in these rules." As such, we find that we have jurisdiction to decide the substantive issues raised in John's appeal.

¶ 45                    Serious Endangerment vs. Best Interests Standard

¶ 46    John alleges the trial court abused its discretion when it only partially granted the relief he was seeking. An abuse of discretion can occur when: (1) no reasonable person could find as the trial court did (*In re Marriage of Koenigsknecht*, 302 Ill. App. 3d 474, 479 (1998)) or (2) the trial court applies the wrong standard (*Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 23). In this case, John alleges that the trial court applied the wrong legal standard when ruling on his petition to modify visitation because it applied the best interest of the children standard to determine whether the custody judgment should be modified. John argues that the correct standard to apply in this case was the serious endangerment standard because a trial court "should grant restricted visitation only after making the extraordinary finding that visitation would seriously endanger the child's physical, mental, moral, or emotional health." Therefore, John argues the trial court abused its discretion by applying the best interest of the children standard.

¶ 47    Betsy, in turn, argues that the trial court did not restrict John's visitation but, rather, John stipulated to his visitation in the custody judgment and, thereafter, sought to increase that visitation. As such, Betsy argues that since the parties agreed by stipulation to any restrictions in John's visitation rights in the custody judgment, the standard to be applied to John's request for a modification of the judgment is whether such a modification is in the best interests of the children. We review the question of whether the trial court applied a proper legal standard *de novo*. *In re Estate of K.E.S.*, 347 Ill. App. 3d 452, 461 (2004) ("Whether the trial court applied the proper legal standard is a question of law and therefore subject to *de novo* review."). For the reasons below, we find that the appropriate standard to review the trial court's February 9, 2015 and April 17, 2015 orders, which modified the custody judgment that had been stipulated to by the parties, is the best interests standard.

¶ 48    Section 607(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) states: "A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral or emotional health." 750 ILCS 5/607(a) (West 2012). On October 29, 2013, the trial court granted sole custody of the three children to Betsy and granted John certain visitation rights including tennis lessons with Sally twice a month and brunch with all the

children, plus an "extra set of hands," every other week. John did not file any appeal relating to his visitation rights as they were outlined and agreed to in the October 29, 2013 custody judgment and more than 30 days has passed since that custody judgment was entered on October 29, 2013.

¶ 49 On June 2, 2014, John filed a "Motion to Increase And/Or Modify Parenting Time" in which John requested additional parenting time with his children. Specifically, John requested increased visitation in the form of 12 hours of visitation on alternating Saturdays and Sundays and, thereafter, alternate weekend visitation from Friday after school until Sunday at 5:00 p.m. On February 9, 2015, the trial court granted John's request in part by lengthening the hours of his visitation from one hour every other week to three hours every other week and denied his request in part by keeping everything else in the custody judgment the same. Section 607(c) states: "The court may modify an order granting or denying visitation rights of a parent whenever modification would serve the best interest of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health." 750 ILCS 5/607(c) (West 2012). The party seeking the modification has the burden of showing that a modified visitation is in the best interest of the child. *Sarchet v. Ziegler*, 278 Ill. App. 3d 460, 462 (1996).

¶ 50 "[S]ection 607 sets out a very cohesive scheme for setting (section 607(a)) and changing (section 607(c)) visitation." *In re Marriage of Chehaiber*, 394 Ill. App. 3d 690, 696 (2009). Here, John is not appealing the October 29, 2013 custody judgment, which *set* his visitation rights by granting sole custody of the three children to Betsy and giving John visitation rights in the form of tennis lessons with Sally twice a month and brunch with all the children, plus an "extra set of hands," every other week. Rather, he is appealing the order entered by the trial court on February 9, 2015, on his petition to modify visitation rights. Given that John requested a modification of the custody judgment to increase his visitation, and the trial court did in fact increase his visitation, we cannot see how the trial court's February 9, 2015 order was in any way a restriction on John's visitation rights such that the serious endangerment standard would apply. *Griffiths v. Griffiths*, 127 Ill. App. 3d 126, 129-30 (1984) ("where the noncustodial parent seeks to modify visitation rights which have been originally granted in the dissolution decree, the burden of proof is upon such parent to show that the modification is in the 'best interest' of the child or children"). As stated in *In re Marriage of Chehaiber*:

> "it is essential to the cohesiveness of section 607 as a whole that we interpret the standard for restricting visitation under section 607(c) as identical to the standard for depriving a parent of reasonable visitation under section 607(a). The only difference between the two–and the reason our interpretation does not render section 607(c) essentially meaningless–is that section 607(a) applies to an initial visitation determination, while section 607(c) applies to a change to an already established visitation schedule." *In re Marriage of Chehaiber*, 394 Ill. App. 3d at 698.

In his motion, John requested an increase in the parenting time that he had previously agreed to in the October 29, 2013 custody judgment, and the trial court increased his visitation hours in the February 9, 2015 order and did not do anything to restrict the visitation rights that had already been established in the October 29, 2013 custody judgment. Therefore, because the trial court did not restrict John's visitation rights but rather expanded his visitation rights, we find the appropriate standard for the trial court to consider is the best interests of the child

standard. 750 ILCS 5/607(c) (West 2012) ("The court may modify an order granting or denying visitation rights of a parent whenever modification would serve the best interest of the child ***.").

¶ 51    John cites several cases for the proposition that the serious endangerment standard should apply to this case. However, all the cases he cites involved either: (1) a request to limit a parent's visitation rights and/or (2) a trial court order that restricts a parent's visitation rights. Neither of those facts are present here.

¶ 52    In *Heldebrandt v. Heldebrandt*, 251 Ill. App. 3d 950 (1993), following the parties' divorce, the father was granted visitation "with any two of the children every Sunday afternoon." *Id*. at 952. A few years later, the father filed a petition to modify his visitation rights to include visitation with "all the children and to occur from Friday evening to Sunday evening, every other weekend, as well as extended periods of time during summer and holiday school breaks." *Id*. at 952. In response, the custodial mother filed a cross-petition to restrict the father's visitation by requiring that the father, "as a prerequisite to visitation with the children, *** obtain counseling for his physically abusive conduct and threats of physical abuse toward the children" and also requiring that the father's current wife be present at all visitations. *Id*. The trial court modified the father's visitation rights by allowing limited visitation with the two youngest children, terminating visitation with the three older children, and allowing unlimited, reasonable telephone visitation with all the children. *Id*. Thus, in *Heldebrandt*, not only did the custodial mother file a petition to restrict the noncustodial father's visitation rights, but the trial court in fact restricted the noncustodial father's visitation rights beyond what the parties had agreed on in the initial custody judgment.

¶ 53    In *In re Marriage of Diehl*, 221 Ill. App. 3d 410 (1991), following the entry of a divorce decree, the trial court awarded custody of the minor child to the father and ordered that visitation with the mother not take place in the presence of the mother's partner or any other female with whom the mother is residing. *Id*. at 420. The mother appealed this ruling. On appeal, and before determining that the serious endangerment standard applied, the appellate court made a finding that the order at issue "clearly restricted [the mother's] visitation with [her child]." *Id*. at 429. Thus, in *In re Marriage of Diehl*, the mother was challenging an order that, as established by the appellate court in that case, restricted her visitation rights, thus making the serious endangerment standard appropriate.

¶ 54    In *In re Marriage of Solomon*, 84 Ill. App. 3d 901 (1980), 16 months after the entry of a judgment of divorce, the custodial mother brought an action to modify the terms of the agreed visitation order to limit the father's visitation rights. *Id*. at 902. The father filed a counterpetition seeking a modification of custody and for court-ordered psychiatric treatments for their daughter. *Id*. The trial court made modifications to the parties' original custody agreement, and the father appealed the trial court's ruling. *Id*. In determining that the serious endangerment standard should have applied to the trial court's modification of the custody judgment, the appellate court stated that "[a] comparison of the visitation provided in the parties' original agreement as against that contained in the judge's order shows the substantial limiting effect of the modification." *Id*. at 907. As such, because the trial court limited the father's visitation rights beyond what the parties had originally agreed upon, the court found that "[t]he standard used by the trial court (best interests) was not appropriate to the initial finding necessary for a restriction of visitation." *Id.*

¶ 55    In the last case cited by John, *In re Marriage of Anderson*, 130 Ill. App. 3d 684 (1985), the custodial mother filed a petition to terminate the father's visitation with his minor children. *Id*. at 685. The trial court did not terminate the father's visitation, but reinstated his visitation with the modification that weekend visits were to be supervised. *Id*. at 686. On appeal, the appellate court made a finding that the "August 10 order clearly restricted the respondent's visitation with [his child]" and, therefore, held that the "trial court erred in restricting the respondent's visitation rights" where it applied the best interests standard of review instead of the serious endangerment standard. *Id*. at 688.

¶ 56    In this case, neither party requested a limitation or restriction of any kind in John's visitation with his children, and the trial court did not restrict or limit John's visitation rights beyond what the parties had already agreed to in the October 29, 2013 custody judgment. In fact, the trial court increased John's visitation from one hour every other week to three hours every other week. As such, all of the cases cited by John for the proposition that the appropriate standard is the serious endangerment standard are inapposite from the present case.

¶ 57                         Trial Court Did Not Abuse Its Discretion

¶ 58    John's argument that the trial court abused its discretion when it issued its February 9, 2015 and April 17, 2015 orders is entirely based upon his argument that it applied the wrong standard. As such, John does not make any argument that the trial court abused its discretion under the best interests standard, and, accordingly, we may affirm the trial court's order on this basis alone. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (appellant's brief shall contain "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. Evidence shall not be copied at length, but reference shall be made to the pages of the record on appeal or abstract, if any, where evidence may be found. Citation of numerous authorities in support of the same point is not favored. Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Nonetheless, given the evidence in the record, and given that minors are involved, we find that the trial court did not err when it issued its February 9, 2015 order granting in part and denying in part John's motion to increase his parenting time.

¶ 59    The trial court is vested with wide discretion in resolving visitation issues. *In re Marriage of Minix*, 344 Ill. App. 3d 801, 803 (2003). We will not interfere with the trial court's determination unless an abuse of discretion occurred or where manifest injustice has been done to the child or parent. *Id*.; *In re Marriage of Diehl*, 221 Ill. App. 3d at 429.

¶ 60    A best interest determination is heavily fact dependant; it cannot be reduced to a simple bright line test, but rather must be made on a case-by-case basis, depending on the circumstances of each situation. *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988). On review, a trial court's determination of what is in the child's best interest will not be reversed unless it is against the manifest weight of the evidence and has resulted in manifest injustice. *In re Marriage of Smith*, 172 Ill. 2d 312, 321 (1996). There is a strong presumption in favor of a trial court's ruling because it had the opportunity to observe the parents and the children and evaluate their temperaments, personalities and capabilities. *Id.*

¶ 61    Here, John sought increased visitation in the form of 12 hours of visitation on alternating Saturdays and Sundays and, thereafter, alternate weekend visitation from Friday after school

until Sunday at 5 p.m. Dr. Palen, who was appointed for the sole purpose of evaluating whether an increase in John's visitation was in the children's best interests, concluded that such an increase was not in the children's best interests. It is within the trial court's discretion to rely on and consider the recommendations of an expert appointed pursuant to section 604(b) of the Act. 750 ILCS 5/604(b) (West 2012). "An abuse of discretion occurs only when no reasonable person could find as the trial court did." *In re Marriage of Ward*, 267 Ill. App. 3d 35, 41 (1994). "A decision is against the manifest weight of the evidence where the opposite result is clearly evident from the record." *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004). Given all the testimony elicited in this case, we cannot say no reasonable judge would enter the trial court's February 9, 2015 order, which increased John's visitation from one hour to three hours every other week while keeping all the other visitation rights as laid out in the October 29, 2013 custody judgment. Therefore, there was no abuse of discretion. Nor can we say that an examination of the evidence shows an opposite result is clearly evident. Therefore, we do not find the judgment was against the manifest weight of the evidence such that it resulted in manifest injustice to either parent. See *In re Marriage of Minix*, 344 Ill. App. 3d at 803.

¶ 62                                                    CONCLUSION

¶ 63        For the above reasons, we affirm the trial court's February 9, 2015 and April 17, 2015 orders.

¶ 64        Affirmed.

- 13 -