NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210478-U

NO. 4-21-0478

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 14, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| FREDRICK D. CARTER, | ) | Appeal from the |
| Petitioner-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| YUCORTUS BOOKER, | ) | No. 20F110 |
| Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the trial court's allocation of
decision-making responsibilities and parenting time did not stand against the
manifest weight of the evidence.

¶ 2    In February 2021, petitioner, Fredrick D. Carter, filed an amended petition

seeking the establishment of a father-child relationship, child support, and allocation of rights

regarding C.C. (born in January 2015), the minor child of Fredrick and respondent, Yucortus

Booker. Yucortus subsequently filed a petition seeking temporary child support from Fredrick. In

August 2021, the trial court issued its ruling on parental decision-making and parenting time.

¶ 3    Yucortus appeals, arguing the trial court erred in its allocation of

(1) decision-making responsibilities and (2) parenting time. Yucortus challenges the court's

judgment as manifestly unjust because it ignored Yucortus's parenting of C.C. throughout his

life, and the evidence supported findings it was in the minor's best interests to live with her in Decatur, Illinois. We affirm.

¶ 4                                                    I. BACKGROUND

¶ 5            In April 2020, Fredrick filed a petition to establish a father-child relationship, child support, and allocation of rights pursuant to the Illinois Parentage Act of 2015 (Parentage Act) (750 ILCS 46/101 *et seq.* (West 2018)) as to C.C., which he amended on February 5, 2021. Fredrick's amended petition requested the trial court (1) confirm the existence of a father-child relationship between Fredrick and C.C.; (2) allocate (a) to Fredrick the majority of parenting time and (b) to the parties joint decision-making responsibilities with regard to C.C.; and (3) order Yucortus to pay him child support. On February 25, 2021, Yucortus filed a petition seeking temporary child support from Fredrick.

¶ 6            In April 2021, the trial court entered a "Stipulated Temporary Order" whereby the parties agreed Yucortus "shall be entitled to parenting time one weekend per calendar month," and she "shall provide Fred with 7 days advance written notice that she intends to exercise said weekend parenting time." As part of the agreement, the court "reserve[d] allocation of parenting time during the child's summer break from school, in the event the case is not resolved in advance of said time." The court also noted the parties had not reached an agreement with respect to (1) the primary parent, (2) the minor's primary residence, and (3) permanent allocation of parenting time.

¶ 7            In July 2021, the trial court held a hearing on the matter. Both parties testified and presented evidence. The following is a summary of the evidence as it relates to the issues presented on appeal.

¶ 8        At the time of trial, C.C. was six years old. Fredrick and Yucortus did not reside together at the time the minor was born and were never married thereafter. Between 2015 and 2020, the parties maintained a co-parenting relationship. They shared decision-making responsibilities without court assistance, and Fredrick voluntarily paid Yucortus $350 on a monthly basis to support C.C. financially. The parties' agreement provided Yucortus with parenting time throughout the week, while Fredrick exercised his parenting time each weekend from Friday evening through Monday morning.

¶ 9        Fredrick lived in Pekin, Illinois, with his wife and three other children. He has worked as the executive chef at Crestwicke Country Club in Bloomington for 16 years. Fredrick testified his work schedule does not interfere with his care of C.C. In his role as executive chef, Fredrick has subordinate chefs to whom he may delegate responsibilities when he has the minor. He typically works "nine months a year with three months off." During the layoff period between December and February, Fredrick receives his regular salary and is available to care for C.C. on a full-time basis.

¶ 10       Fredrick indicated he began requiring C.C. to wear pull-up diapers to address the minor's problem with bed-wetting in spring 2020. Fredrick testified Yucortus "didn't want [C.C.] in pull-ups" and would routinely withhold the minor from him if they had disagreements. Fredrick stated, "If I have a disagreement with [Yucortus], it usually ends with you either do what I say or there's consequences. And consequences is [*sic*] usually [C.C.] doesn't get to come home with us."

¶ 11       C.C. weighed 120 pounds, and Fredrick testified he had concerns about the minor's health. Fredrick stated he rarely allowed C.C. to eat "fast food." Instead, Fredrick prepared C.C. healthier options, such as fresh fruits and vegetables, and encouraged the minor

"to take in smaller amounts of food rather than large amounts." Fredrick enrolled C.C. in baseball, basketball, and swimming. While Fredrick did not blame Yucortus entirely for the child's obesity, Fredrick alleged each time he picked C.C. up, "he would come out with some kind of McDonald's or something. One time it was fried chicken." Fredrick also recalled C.C. having "a chicken nugget meal with French fries, a caramel Frappe and a McFlurry." Fredrick further testified about an incident which occurred in November 2020, after he observed a skin rash presenting "around the top of [C.C.'s] head." Although C.C. had been prescribed an ointment to treat a ringworm infection, Fredrick alleged Yucortus failed to consistently provide the medication to him during weekend visits with C.C. Fredrick scheduled a doctor's appointment after the infection "started showing up in the corner of [C.C.'s] eye and it started going down the back of his head." The minor was prescribed a liquid medication, and Yucortus initially agreed with the course of treatment. However, when Fredrick "texted her to see if she was giving [C.C.] the medication, *** she told [him] she stopped giving [C.C.] medication because *** the prescription was too strong for him."

¶ 12        Fredrick testified to his concern regarding C.C.'s education. He stated C.C. "just completed kindergarten" but would "come to us with large amounts of homework." On one occasion, Fredrick assisted C.C. in completing "31 or 41" overdue assignments. According to Fredrick, Yucortus frequently refused to send C.C.'s school tablet, which made it difficult to assist the minor with his homework. Further, Fredrick testified about having to arrange extra transportation for C.C. due to Yucortus failing to pick him up after school. Fredrick recalled C.C. being left unattended after getting off the bus when he "was either 3 or 4." After he received a call from the minor's preschool, Fredrick arranged for C.C. to be picked up by another family member. Fredrick attempted to contact Yucortus but was unable to reach her "until later on."

¶ 13    Alissa, Fredrick's wife, testified they have been married for two years. She stated Fredrick was "in every way a good father" and was "involved with everything and aspects of the kids as far as from getting them ready in the morning to putting them to bed at night. He runs into practices. He's involved in their school. He's involved in doctor's appointments. He's supportive. He disciplines if necessary." Alissa testified C.C. was "really close" with his siblings and "every birthday party, every holiday, every get-together, is all scheduled around when [C.C.] will be home." During the split parenting, Alissa noticed C.C. "definitely has some continence [*sic*] issues, especially at nighttime." Alissa stated C.C. "wet the bed every single night *** and it would be everywhere if he didn't have a pull-up on."

¶ 14    Yucortus testified she lived in Decatur, Illinois, and had four children. She was employed at Archer-Daniels-Midland Company (ADM) and primarily worked third shift. Yucortus claimed her work schedule does not impact her ability to care for C.C. and indicated her teenage daughter attends the minor whenever she is sleeping, although she maintained, unlike most people, she did not sleep. Yucortus believed she was C.C.'s primary caregiver "[b]ecause [she] *** signs him up for school and doctor appointments." Yucortus stated she enrolled C.C. in basketball and football.

¶ 15    Yucortus found co-parenting to be "somewhat" difficult, but she testified Fredrick was a good father who provided the majority of transportation for visitation. Even so, Yucortus refused Fredrick's requests to meet in Bloomington and insisted the parties exchange C.C. in Clinton on Friday evenings. On Monday mornings, Fredrick dropped C.C. off at school in Decatur. Yucortus testified Fredrick never succeeded in changing her mind over any significant parenting issue. She also admitted previously withholding C.C. from Fredrick over disagreements she "felt strongly about." For example, Yucortus testified she spoke with Fredrick

after she became aware he required C.C. to wear "pull ups" because of bed-wetting. Yucortus indicated C.C. should not be wearing diapers at his age because "putting a diaper on is not helping him, it is hurting him." Yucortus claimed C.C. did not wet the bed in her home, but she acknowledged telling Fredrick she would be withholding the minor "until he is potty trained." Moreover, Yucortus unilaterally halved Fredrick's parenting time—without considering how it might negatively affect C.C.'s relationship with him—following Fredrick's filing of his petition to secure an enforceable parenting time schedule in April 2020.

¶ 16    According to Yucortus, Fredrick always acted in C.C.'s best interests with respect to the minor's education. Further, Yucortus acknowledged her teenage daughter failed to properly assist C.C. with his schoolwork while Yucortus trained for a new position at ADM. She also rejected Fredrick's suggestion the parties temporarily change the parenting time schedule during his layoff period so he could assist C.C. in catching up with his homework full-time. When asked what harm the proposed change in schedule might have caused, Yucortus stated, "None."

¶ 17    In August 2021, after considering the evidence presented and the arguments of counsel, the trial court entered a written judgment pronouncing its findings. The court found each party spent significant time taking care of the minor and C.C. seemed well-adjusted to both parents' homes and communities. Regarding each parent's level of participation in past significant decision-making, the court noted Yucortus "made most *** of the significant decisions in the past. She enrolled the child in Decatur schools and has made most of his doctor's appointments." The court also considered the parents' course of conduct with respect to parental decision-making and found Fredrick "instrumental in making sure C.C.'s assignments were turned in and did his best to help his son succeed in school." The court found Fredrick "worked

- 6 -

hard with C.C. to get him back on track" when the minor's schoolwork was lacking. It also found Fredrick to be "very concerned about his child's weight gain and incontinence issue[s] as he should be." As to each parent's ability to cooperate and the level of conflict between them, the court determined the parties were "unable to cooperate and have had a moderate level of conflict" due to Yucortus's unwillingness "to cooperate and compromise when it comes to decisions about her son and parenting time disputes."

¶ 18 Regarding parenting time, the trial court considered the overall health of the parties involved and noted, "C.C. is overweight (120 lbs at six years old) and still wets his pants. He has also had ringworm in the recent past." The court found C.C.'s health to be "a major concern of [Fredrick's]," and it determined C.C.'s needs were not being met, "as evidenced by the weight gain and incontinence." "It was unclear to the Court whether [Yucortus] considered C.C.'s weight issue to be a big concern." The court ultimately found Fredrick willing to address the minor's obesity and incontinence, and thus, the factor favored Fredrick.

¶ 19 As to the distance between the parents' residences and their ability to cooperate, the trial court noted Yucortus refused to cooperate with Fredrick on the issue of transportation despite the parties living "approximately 80 minutes away from each other." As a result, Fredrick provided "the majority of the transportation at [Yucortus's] request." The court found the distance between the parties to be unrealistic while school was in session and explained, "If the parties lived closer to each other, [Yucortus's] parenting time during the week could include her days off."

¶ 20 In addressing the parties' willingness and ability to facilitate a close and continuing relationship between the other parent and the child, the trial court found Fredrick "capable of fostering and encouraging a close relationship between mother and son and

understands the importance of that relationship." On the other hand, the court determined Yucortus "unilaterally, significantly reduced [Fredrick's] time with the child," and she did so "without any thought as to how that might affect [Fredrick's] relationship with their child and how that action may be harmful to their child." The court further found "it was clear that [Yucortus] was upset with [Fredrick] over the pull up issue *** and as retaliation cut off his parenting time."

¶ 21　　　　Based on its evaluation, the trial court awarded Fredrick the majority of the available parenting time and allocated (1) joint parental decision-making relating to religion and extracurricular activities and (2) sole decision-making responsibilities to Fredrick with respect to education and health. The court's written parenting plan listed the significant decision-making responsibilities for the respective parents. The plan also provided Yucortus with parenting time every other weekend from 5 p.m. on Friday to Sunday at 5 p.m. and various times during the summer, holidays, and school breaks.

¶ 22　　　　This appeal followed.

¶ 23　　　　　　　　　　　　　　II. ANALYSIS

¶ 24　　　　On appeal, Yucortus argues the trial court erred in its allocation of (1) decision-making responsibilities and (2) parenting time. Yucortus challenges the court's judgment as manifestly unjust because it ignored Yucortus's parenting C.C. throughout his life, and the evidence supported findings it was in the minor's best interests to live with her in Decatur, Illinois.

¶ 25　　　　As an initial matter, we note this case has been designated as accelerated pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018). Rule 311 states in relevant part that

"[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 26 In this case, Yucortus filed her notice of appeal on August 24, 2021. As a result, a disposition would otherwise be required by January 21, 2022. Yucortus also requested oral arguments in her initial brief filed on October 15, 2021. Arguments were heard on January 25, 2022. For these reasons, good cause exists for issuing this decision after the 150-day deadline of January 21, 2022.

¶ 27 A. Decision-Making Responsibilities

¶ 28 Yucortus first argues the trial court's allocation of decision-making responsibilities is against the manifest weight of the evidence and unjust. We disagree.

¶ 29 In determining custodial matters, the trial court is required to apply the relevant standards found in the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/101 *et seq.* (West 2018)). 750 ILCS 46/802(a) (West 2018). Section 602.5(a) of the Dissolution Act (750 ILCS 5/602.5(a) (West 2018)) requires the trial court to allocate decision-making responsibilities according to the child's best interests. Section 602.5(b) of the Dissolution Act permits the court to allocate to one or both parents the significant decision-making responsibility for significant issues affecting the child and lists those significant issues, without limitation, as ones involving education, health, religion, and extracurricular activities. 750 ILCS 5/602.5(b) (West 2018).

¶ 30 Section 602.5(c) of the Dissolution Act (750 ILCS 5/602.5(c) (West 2018)) provides the relevant factors the trial court is to consider, without limitation, when determining the child's best interests for purposes of allocating significant decision-making responsibilities, which include: (1) the wishes of the parents and child; (2) the child's needs and adjustment to his

or her home, school, and community; (3) each parent's level of participation in making significant decisions with respect to the child; (4) the mental and physical health of all individuals involved; (5) the parents' ability to cooperate or the level of conflict between them, which may affect their ability to share decision-making; (6) the parents' willingness and ability to facilitate a close and continuing relationship between the other parent and child; and (7) the distance between the parents' residences as well as the cost and difficulty in transporting the child.

¶ 31 "On appeal, we give great deference to the trial court's best-interests findings because that court had a better position than we do to observe the temperaments and personalities of the parties and assess the credibility of witnesses." (Internal quotation marks omitted*.) In re B.B.*, 2011 IL App (4th) 110521, ¶ 32, 960 N.E.2d 646; see also *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25, 991 N.E.2d 944 (stating, "[i]n child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child"). "[A] reviewing court will not reverse a trial court's custody determination unless it (1) is against the manifest weight of the evidence, (2) is manifestly unjust, or (3) results from a clear abuse of discretion." *B.B.*, 2011 IL App (4th) 110521, ¶ 32.

¶ 32 Here, the trial court awarded Yucortus and Fredrick joint responsibility with respect to C.C.'s religious and extracurricular activities. The court allocated sole decision-making responsibility as to C.C.'s healthcare and education to Fredrick. However, the parenting plan stated this shared responsibility required the parents to notify the other of any emergency medical care and share all information pertaining to C.C.'s school records, childcare, and medical information.

¶ 33 In looking at the applicable statutory factors under section 602.5(c) (750 ILCS 5/602.5(c) (West 2018)), the trial court considered multiple factors in this case. Regarding each parent's level of participation in past significant decision-making, the court noted Yucortus "made most *** of the significant decisions in the past." The court also considered C.C.'s physical health and found Fredrick "very concerned about his child's weight gain and incontinence issue[s] as he should be." Regarding the parents' prior agreements or course of conduct with respect to decision-making, the court found this factor favored Fredrick, noting he "worked hard with C.C. to get him back on track" when C.C.'s schoolwork was lacking. As to each parent's ability to cooperate, or the level of conflict between them which may affect their ability to share decision-making, the court again found this factor favored Fredrick due to Yucortus's unwillingness "to cooperate and compromise when it comes to decisions about her son and parenting time disputes." Moreover, because Fredrick received the majority of parenting time, it was in C.C.'s best interests he have the decision-making authority with respect to C.C.'s healthcare and education. Nothing in the record indicates Fredrick neglected C.C.'s physical health or education since his birth. In fact, the trial court found Fredrick "instrumental in making sure C.C.'s assignments were turned in and did his best to help his son succeed in school." While there was some testimony regarding C.C.'s possible regression from wearing "pull-ups," nothing indicates it had a long-lasting detrimental impact on C.C.

¶ 34 In our view, Yucortus's argument the trial court "misconstrued and misapplied the evidence presented to the factors set forth in [the Dissolution Act]" is an attempt to have this court reweigh the evidence and judge witness credibility, which we will not do. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51, 165 N.E.3d 501. The court heard testimony from Yucortus and Fredrick, and throughout the proceedings, it observed their demeanor on the

witness stand and in the courtroom. The parties sometimes gave conflicting testimony. Custody matters can turn on credibility. See *In re Marriage of Spent*, 342 Ill. App. 3d 643, 652, 796 N.E.2d 191, 199 (2003). The court's ruling indicates it credited Fredrick's testimony, which was its prerogative to do. We defer to that credibility determination "[b]ecause the trial court [was] in a far better position to observe the temperaments and personalities of the parties and assess [their] credibility." (Internal quotation marks omitted.) *Spent*, 342 Ill. App. 3d at 652. Overall, the court's decision awarding (1) the parents joint parental decision-making relating to religion and extracurricular activities and (2) sole decision-making responsibilities to Fredrick with respect to education and healthcare is not against the manifest weight of the evidence because there was evidence to support it, and the opposite conclusion is not readily apparent. See *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 80, 667 N.E.2d 1094, 1100 (1996). We see no reason to disturb the "strong and compelling presumption in favor of the result reached by the trial court." (Internal quotation marks omitted.) *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64, 92 N.E.3d 1070.

¶ 35                                    B. Parenting Time

¶ 36             Yucortus next argues the trial court's allocation of parenting time stands against the manifest weight of the evidence. We disagree.

¶ 37             Section 802(a) of the Parentage Act (750 ILCS 46/802(a) (West 2018)) states the issue of parenting time is governed by the relevant provisions of the Dissolution Act. Section 602.7(a) of the Dissolution Act (750 ILCS 5/602.7(a) (West 2018)) states the trial "court shall allocate parenting time according to the child's best interests." Section 602.7(b) (750 ILCS 5/602.7(b) (West 2018)) sets forth several factors the court is to consider when determining the child's best interests for purposes of allocating parenting time, including, *inter alia*, (1) the

wishes of the parents and the child; (2) the amount of time each parent spent performing caretaking functions in the 24 months preceding the filing of the petition for allocation of parental responsibilities; (3) the interrelationship between the child and his or her parents and siblings; (4) the child's adjustment to his or her home, school, and community; (5) the child's needs; (6) the overall health of the parties involved; (7) the distance between the parents' residences; and (8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.

¶ 38    The best interests of the child are the primary consideration in all decisions affecting children, including the allocation of parenting time. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 41, 990 N.E.2d 698. "A trial court's findings as to a child's best interest are entitled to great deference because the trial judge is in a better position than we are to observe the personalities and temperaments of the parties and assess the credibility of the witnesses." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21, 97 N.E.3d 566. A court's determination regarding a child's best interests will not be reversed on appeal unless the decision is against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *In re Parentage of P.D.*, 2017 IL App (2d) 170355, ¶ 18, 87 N.E.3d 1040. A decision is against the manifest weight of the evidence when the opposite result is clearly evident from the record. *In re Marriage of Betsy M.*, 2015 IL App (1st) 151358, ¶ 61, 46 N.E.3d 373.

¶ 39    In its ruling, the trial court found several statutory factors relevant and applicable. As to the parties' performance of caretaking functions in the 24 months preceding the filing of the petition for allocation of parental responsibilities, the court found each parent spent significant time taking care of the minor, and C.C. seemed well-adjusted to both parents' homes and communities. In considering the overall health of the parties involved, the court stated, "C.C.

is overweight (120 lbs at six years old) and still wets his pants. He has also had ringworm in the recent past." The court determined C.C.'s needs were not being met, "as evidenced by the weight gain and incontinence," and found Fredrick was willing to address those issues. In doing so, the court noted C.C.'s health was "a major concern of [Fredrick's]," whereas "[i]t was unclear to the Court whether [Yucortus] considered C.C.'s weight issue to be a big concern." Thus, the court found the factor favored Fredrick.

¶ 40 The distance and need for transportation between Decatur and Pekin caused concern for the trial court. Despite living "approximately 80 minutes away from each other," Yucortus refused to cooperate with Fredrick on the issue of transportation. As a result, Fredrick provided "the majority of the transportation at [Yucortus's] request," which the court determined was unrealistic while school was in session. The court found the factor favored Fredrick and explained, "If the parties lived closer to each other, [Yucortus's] parenting time during the week could include her days off."

¶ 41 In addressing the parties' willingness and ability to encourage a close and continuing relationship between the other parent and the child, the trial court found Yucortus "unilaterally, significantly reduced [Fredrick's] time with the child," and she did so "without any thought as to how that might affect [Fredrick's] relationship with their child and how that action may be harmful to their child." The court noted, "it was clear that [Yucortus] was upset with [Fredrick] over the pull up issue *** and as retaliation cut off his parenting time." However, the court found Fredrick "capable of fostering and encouraging a close relationship between mother and son and understands the importance of that relationship." Ultimately, the court found the factor favored Fredrick.

¶ 42    As stated above, the trial court's decision with respect to the best interests of the child is entitled to great deference because it observed the witnesses and could assess their credibility firsthand. *Whitehead*, 2018 IL App (5th) 170380, ¶ 21. Here, the court considered the applicable factors and decided Fredrick should receive the majority of the parenting time. Since the evidence does not lead us clearly to the opposite conclusion, we cannot say the trial court's decision to award Fredrick the majority of parenting time was against the manifest weight of the evidence. See *Betsy M.*, 2015 IL App (1st) 151358, ¶ 61.

¶ 43    As a final matter, we thank the trial court for its thorough and well-reasoned written order. We found this particularly helpful in our consideration of this appeal.

¶ 44                    III. CONCLUSION

¶ 45    For the foregoing reasons, we affirm the trial court's judgment.

¶ 46    Affirmed.