NOTICE
Decision filed 10/19/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230351-U

NO. 5-23-0351

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| MORGAN L., | ) | Williamson County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 21-D-204 |
| | ) | |
| GREGORY L., | ) | Honorable |
| | ) | Amanda Byassee Gott, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's allocation of significant parental decision-making authority and the majority of the parenting time to the petitioner mother was not against the manifest weight of the evidence.  The court's valuation of the marital property, classification of payments made by the respondent father's parents toward the marital estate as gifts to the parties, and allocation of daycare expenses were not against the manifest weight of the evidence or an abuse of discretion. Additionally, we made modifications to correct identified typographical errors by the trial court.  Thus, we affirm the trial court's decisions as modified.

¶ 2    This appeal concerns the dissolution of marriage action between the petitioner, Morgan L., and the respondent, Gregory L. Gregory raises four issues on appeal: (1) the trial court's allocation of parenting time was against the manifest weight of the evidence, (2) the court's allocation of parental responsibilities was against the manifest weight of the evidence, (3) the court erred in the

1

valuation of the marital property, and (4) the court erred in its allocation of debt. For the following reasons, we affirm as modified.[1]

¶ 3                                    I. BACKGROUND

¶ 4     Initially, we note that Morgan has failed to file an appellee's brief. There are three distinct, discretionary options a reviewing court may exercise in the absence of an appellee's brief: (1) it may serve as an advocate for the appellee and decide the case when the court determines justice so requires, (2) it may decide the merits of the case if the record is simple and the issues can be easily decided without the aid of the appellee's brief, or (3) it may reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record. *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (2009). In this case, the record is simple, and the claimed errors are such that we can easily decide them without the aid of appellee's brief.

¶ 5     Morgan and Gregory were married on July 17, 2010, and had two children, K.G.L., born January 22, 2013, and K.J.L., born November 3, 2016. They resided in the marital home located on 83 acres in rural Dongola, Illinois. On July 28, 2021, Morgan filed a petition to dissolve the parties' marriage.

¶ 6     In February 2023, Gregory filed a notice of intent to claim nonmarital contribution to the marital estate. In August 2012, he and Morgan purchased 82.10 acres; the mortgage was in both of their names. According to Gregory, they entered into an oral agreement with his parents to

_____

[1]Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), except for good cause shown, this court is to issue a decision within 150 days after the filing of the notice of appeal. Accordingly, Rule 311(a)(5) requires the decision in this case to be filed on or before October 10, 2023. In order to give this case the attention it deserves, this court finds it necessary to file this disposition past the due date, and we find good cause to issue our decision outside the 150-day timeframe.

purchase the property, and his parents would pay one-half of the earnest money, down payment, monthly mortgage payments, real estate taxes, and homeowner's insurance. After Gregory and Morgan built a house on the property, they would transfer 46.10 acres to his parents, so the land would be separated into two tracts. In the 10 years since the purchase, his parents had contributed $2000 to the cost of the earnest money, $11,500 for one-half of the down payment, $75,240 for one-half of the monthly mortgage payments, one-half of the real estate taxes, one-half of the homeowner's insurance, and $65,000 for renovations made to the house that was located on the property. Morgan stopped making payments toward the property in June 2021 when the parties separated. Gregory requested that the trial court award his parents a one-half interest in the value of the equity in the marital real estate.

¶ 7    At the three-day trial in February and March 2023, Stacy Browning testified that she ran an in-home daycare, and she had watched the parties' children for several years. During that time, she frequently interacted with both parties, but she interacted more with Morgan, as Morgan usually transported the children to and from her house. When communicating with them, she normally texted Morgan. However, if there was a serious issue, she contacted them both. Morgan and Gregory were very loving parents who enjoyed the children and wanted the children to have fun. Morgan was more involved in assisting K.G.L. with his schoolwork, and Gregory took them hunting and fishing. Browning noted that the children were always excited to see Gregory, and, although they loved Morgan, they knew that she would make them complete homework before they could play.

¶ 8    Mikah Streuter, Morgan's sister, testified that she lived in Murphysboro, and she had two children the same ages as the parties' children. She saw Morgan and the children approximately once per month, but she and Morgan spoke on the phone daily. Morgan took the children to their

3

doctor's appointments, helped K.G.L. with his homework, and did what needed to be done for the children. When the divorce proceedings began, Streuter noticed that K.G.L. was acting out more and was aggressive with K.J.L. and Morgan. Although Morgan was upset about K.G.L.'s unusual behavior, she was patient and able to calm him down.

¶ 9     During the parties' marriage, Morgan had expressed concern about Gregory's alcohol and cocaine use, and in June 2015, she indicated that Gregory was going to treatment. However, after he was released from rehabilitation, Streuter observed him drinking when they were all on a family vacation. She also believed that he was using cocaine then. She recalled an incident in the summer of 2021 where she was on the phone with Morgan, and she heard Gregory tell Morgan, "Get off the phone, you stupid bitch."

¶ 10     Barbara Helfrich, Morgan's mother, testified that she lived in Murphysboro, and she saw Morgan and the children every week. Helfrich noted that Morgan was a very good mother; she put the children first; and she had the children on a regular schedule, making sure they completed their homework and went to bed on time. Morgan also took the children to their doctor's appointments. Before the parties' separation, Morgan generally performed the caretaking functions for the children. Early in the separation, she observed K.G.L. acting out and being defiant with Morgan. During an incident, Morgan called Helfrich because K.G.L. was throwing things at her and hitting her. Helfrich and her husband went to the house and observed that K.G.L.'s behavior was unusual in that he refused to talk or listen to any of them. K.G.L. eventually told them that he was upset because Morgan had cheated on Gregory, and Morgan did not care about them. Helfrich noted that, prior to this incident, K.G.L. was at Gregory's house. When Gregory struggled with his substance abuse issues, Morgan supported him and helped him get into rehabilitation.

4

¶ 11    Timothy Rich, Morgan's boyfriend, testified that he was employed by the Department of Veterans Affairs (VA), and he met Morgan at work; she was a patient advocate at the VA. They had been in a relationship since August or September 2021, but they did not live together. He interacted with Morgan and the children three to four times per week, and during those interactions, he observed that Morgan had a very loving and caring relationship with the children.

¶ 12    Throughout the divorce proceedings, Morgan was understanding of the children's feelings, and she reassured them that the divorce was not their fault and was not something they should worry about or be involved in. Rich noticed that, when the children returned from Gregory's home, they were frustrated and angry with Morgan. They said that Rich was a bad guy, and they did not like him. They also said that Morgan was a cheater, she did not care about them, she was the reason why the divorce was happening, and they did not have to listen to her. Although Morgan was hurt by the comments, she let them know it was fine to talk about their feelings, and she loved them, but it was inappropriate for Gregory to make those comments to them. These incidents had lessened, but they still occurred after Gregory's parenting time.

¶ 13    Rich indicated that he accompanied Morgan to a January 2022 parenting time exchange because Gregory had been physically provoking toward her during past exchanges. He described a past incident where Gregory climbed into the car with Morgan and screamed at her in front of the children. During the January exchange, Gregory started screaming at him in the children's presence. Rich saw messages between Morgan and Gregory where Morgan contacted Gregory about the children's school or their behaviors, and he responded by saying that it was her fault, she stole his children, and she took off with them. Rich also described a recent incident where Morgan contacted Gregory to move their parenting time exchange to earlier because there was an impending ice storm. However, Gregory refused to meet her at an earlier time at their exchange

5

location and instead wanted her to pick them up from his house; the parenting time exchanges occurred at the police station because of past incidents.

¶ 14 Rich had two children, a 22-year-old son and a 9-year-old daughter, and his daughter got along really well with Morgan's children; they played and joked around, they swam at his house, and they did other activities together. Rich had conversations with K.G.L. to ease K.G.L.'s mind about his relationship with Morgan. In those conversations, Rich reassured K.G.L. that the issues between his parents were not his fault, he should respect both of his parents and let them handle their issues, and he should just be a child. His current relationship with the children was fantastic, and they did activities together, such as wrestling, jiu jitsu, and playing video games.

¶ 15 Meghan Blechle, Morgan's sister, testified that she had two children that were a little older than Morgan's children. She saw Morgan and the children about two times per month. Before the separation, she noticed that, during family get-togethers, Morgan was always engaged with the children, getting them food, or taking them to the bathroom.

¶ 16 Morgan testified that, during the marriage, she lived in Dongola, which was approximately 20 minutes from the children's school. After the separation, she moved to Carterville, which was about 40 or 45 minutes from the marital home. She moved to Carterville because the marital home was in the "middle of nowhere"; they had no family or friends in the area; she wanted to move closer to her family, who lived in Murphysboro; and Carterville had one of the best school districts in the area. Gregory's family also lived in Murphysboro, so they were closer to them.

¶ 17 Before the separation, the children attended school in the Cypress School District; K.G.L. attended school there through second grade, and K.J.L. attended preschool there. K.G.L. was in fourth grade at Carterville school and was receiving good grades, K.J.L. was described by his teacher as one of the most likeable children in his class, and they both had friends at school. K.G.L.

6

played basketball, K.J.L. wanted to play soccer, and they did jiu jitsu. K.G.L. also liked to compete in motocross competitions, and he was nationally ranked. Motocross racing was a major part of their family life during the marriage, and Gregory spent a lot of time working on the dirt bikes. Neither child had friends that were still attending the Cypress school.

¶ 18    During the end of the 2020-21 school year, K.G.L. had behavioral issues in school. He was very disrespectful to his teacher; he was not paying attention in class, especially during group projects; and he told his teacher that he did not have to listen to her. This behavior was similar to his previous bad behavior at Cypress. Morgan explained that K.G.L. had behavioral issues the entire time that he was at Cypress; he was sent to the principal's office in prekindergarten, and his behavior got worse in second grade. She had a lot of communications with his teacher at the time. She believed that his behavior had improved in the third grade because his teacher was male, and his previous teachers were female. She noted that he had an issue with seeing women as authority figures as he did not respect them. In contrast, he did not talk back to and listened to his male teacher. She believed that this behavior was caused by being a witness to how Gregory talked to her throughout the years. Morgan presented a text message where Gregory referred to K.G.L.'s second grade teacher as a "fucking bitch" and noted that this was indicative of how Gregory referred to the teachers at Cypress.

¶ 19    Morgan indicated that Gregory struggled with substance abuse issues during their marriage. In May 2015, there was an incident where she was concerned that Gregory was using cocaine, and he had expressed suicidal thoughts, so she took him to the Marion VA emergency room. They diagnosed him with manic depression, he tested positive for cocaine, and he was thereafter admitted to a substance abuse and mental health treatment facility. Although part of his aftercare treatment was for substance abuse, he never completed that treatment. He left the

7

rehabilitation facility early to go with her on a family vacation. During that vacation, he got intoxicated and destroyed the room that they were staying in; they were unable to get their deposit back because of the room's condition. In August 2017, he was drinking, got into an argument with a bartender, and was subsequently arrested for disorderly conduct and public intoxication. She recounted an April 2021 incident where he was drinking while driving, and she and the children were in the vehicle. There were several instances where he would stay out until all hours of the night, and she estimated that, in June 2021, he was drinking 6 to 10 beers daily.

¶ 20    Morgan did not believe that she and Gregory could communicate effectively to have shared parental decision-making responsibility. She explained that, on several occasions, when she messaged him about issues with the children, his responses were irrelevant to her message and instead blamed her for something or brought up the past. There was also a history of Gregory being inappropriate toward her, swearing at her, and calling her names, which inhibited her ability to properly communicate with him. Morgan noticed that, after returning from visiting Gregory, the children's behavior toward her changed; they were very angry at her and refused to talk to her.

¶ 21    Morgan introduced an August 2, 2018, text message exchange between her and Gregory where she was asking him for help because K.J.L. was sick, and he responded, "I have never heard such pussy ass whining in my life. Grow a damn back bone." She also introduced text messages from October 12, 2018, where he called her a "stupid bitch"; December 28, 2018, where he asked her if she was "fucking stupid" and called her a "goddamn idiot"; and May 22, 2019, where he responded to her telling him to turn down his music by saying, "Eat a pussy, you fucking lesbian." There was also a text message exchange from September 18, 2019, where she had messaged him about mowing the lawn next to the children's bedroom during their bedtime, and he responded,

8

"We have 40 acres to mow, but you choose to keep your fat ass upstairs and not get down here and make my fucking dinner. You may be a lesbian, but I am not, dumb bitch."

¶ 22   Morgan also testified about an incident that occurred in May 2020 where Gregory belittled her in front of the children by calling her a "rent-a-mom" and a "fucking fat bitch." After she texted him that that would be the last time that he belittled her in front of the children, he responded, "Shut your fat fucking mouth, you piece of shit lazy fucking cunt." She testified about another incident that occurred on July 23, 2020, where Gregory was in the children's playroom with them, and he stepped on a toy, became upset and started yelling, kicked a hole in the entertainment center, and was throwing things. Gregory had also called K.G.L. an idiot and "pussy" to his face.

¶ 23   Morgan testified that she never spoke negatively about Gregory to the children or shared sensitive aspects of the litigation with them. However, there had been instances where he spoke negatively about her to the children. She noted one incident in June 2021 where he and the children called her on FaceTime while she was with friends, and he told the children, "See, she doesn't care about her family. She would rather be out with her friends." She recounted another incident that occurred in September 2021 where she overheard Gregory telling K.G.L. that she had cheated on him and she had been in a relationship with another man for quite some time. She also overheard a conversation between him and the children where he told the children,"Tell that fat bitch to shut up," referring to her. She observed the derogatory language being mirrored in her children's behavior, noting that they had called her a "little fat girl" and a pig before. She also discussed incidents of Gregory being physically violent; he hit her over the head with a beer bottle, and he grabbed K.G.L. by the throat when K.G.L. was younger.

¶ 24   Morgan testified that, in September 2021, she sought an order of protection against Gregory, and she believed that he shared the allegations in the petition with the children because

9

K.G.L. asked specific questions about them. She confronted Gregory about it, and he responded that he was not going to hide anything from the children.

¶ 25    Morgan testified about an incident where K.G.L. was aggressive with her and her parents and how she sent Gregory a message about it. When he responded three days later, he blamed her for K.G.L.'s behavior and said that she needed to work on her relationship with K.G.L. because there was nothing wrong with K.G.L. In July 2021, she put K.G.L. in counseling, and Gregory was against it because he claimed that it put a stigma on K.G.L. and portrayed that K.G.L. was the problem when the real problem was her. K.G.L. stopped attending counseling in April 2022 because he claimed it was stupid and did not work. However, she noticed that his behavior had improved, and he was using the techniques that he learned.

¶ 26    During the marriage, Morgan took the children to their dentist and doctor appointments, and she was responsible for the caretaking functions, such as making sure they were fed, put to bed on time, and had clean clothing. She also helped them with their homework and took care of them when they were sick. K.J.L. had a lot of illnesses and breathing issues when he was younger, and she and Gregory disagreed about how to care for him. She related one incident where she asked for Gregory's help in getting K.J.L. to take his medicine, and Gregory responded that if it was "up to him that he would hold the child down and shove it up his ass." During that incident, he also called her a "worthless piece of shit," a "cunt," and a "bad mom" in front of the children.

¶ 27    Morgan indicated that she had concerns about the children's safety when they were in Gregory's care. On Memorial Day weekend in 2022, Gregory took K.G.L. to the lake and posted a video on Facebook showing Gregory drinking beer while K.G.L. jumped off the top of the pontoon boat into the lake with no life jacket. Morgan noted that K.G.L. could swim but was not a strong swimmer. Because of this incident, there was an investigation conducted by the Illinois

10

Department of Children and Family Services (DCFS). When she questioned Gregory about the incident, he told her that the children were wearing their life jackets. She also recounted another incident in October 2022 where she found out that K.G.L. had been injured during Gregory's parenting time when she picked the children up from him. K.G.L. was injured while riding his dirt bike without a helmet; he had ridden headfirst into a truck. Although K.G.L. had two black eyes, and his head was extremely swollen, Gregory did not feel that it was necessary to take him to the doctor. K.G.L. indicated that he had wanted to call her after it happened, but Gregory would not let him.

¶ 28 Although the current parenting plan provided that Gregory could have direct communication with the children, Morgan acknowledged that she took K.G.L.'s cell phone away from him. She noted that Gregory could call her cell phone or their home phone to talk to the children. She acknowledged that she made an agreement with Gregory that she would maintain a phone for one child, and he would maintain a phone for the other child, but she stopped following that agreement when she suspected that he was tracking her location on the cell phone.

¶ 29 Gregory testified that he lived on several acres in Dongola and was employed by the Illinois Department of Transportation. He noted that his children were everything to him; they liked to do activities together, such as hunting, fishing, riding motorcycles; and he provided for their needs. Gregory attended K.G.L.'s basketball practices and games, parent-teacher conferences, and school orientations. While the children were with him, he took care of them when they were sick, did the grocery shopping and laundry, and cooked for them.

¶ 30 Gregory believed that K.G.L. should have a cell phone while at Morgan's house because they rarely answered the home phone, and she did not allow them to talk freely. She blocked him on the cell phones, so he could not contact the children, and he had to contact them through a video

11

game. K.G.L. eventually unblocked his number so they could communicate and then K.G.L. deleted the messages to keep Morgan from finding out. Gregory indicated that there had been instances where he believed that K.G.L. did not feel safe at Morgan's house, so he wanted to have direct contact with K.G.L. K.G.L. did not have any behavioral issues with him, and he believed that Morgan was more controlling. He allowed K.G.L. to be his own person and to make his own choices instead of telling K.G.L. what to do. He denied trying to negatively influence the children about Morgan.

¶ 31 Gregory indicated that Morgan had not always kept him informed about the children's activities; he had to learn where and when they were doing jiu jitsu through Facebook. Although he complained about Morgan not providing him with school-related information, he acknowledged that he could obtain that information on his own through the program that the school utilized to give information to parents. He testified that Morgan refused to allow the children to attend a motocross race one weekend because it fell on her weekend, and he had not given her the requisite five days' notice. Gregory described an incident where he took the children when it was not his weekend after he received a phone call from Morgan saying that K.G.L. was out of control, and she had to restrain K.G.L. He also noted another instance where he took the children when Morgan was quarantined for COVID-19.

¶ 32 Although Gregory acknowledged that there had been some issues with communication between him and Morgan, he believed they could share parental decision-making authority. He believed that it was in the children's best interests for them to attend school in the Cypress school district because they wanted to go to school there, they had a lot of friends there, the school had smaller classrooms, and they had been flourishing there. He also believed that it was in their best interests for him and Morgan to have equal parenting time. He did not disagree with Browning's

12

testimony that she had more contact with Morgan than him. He also acknowledged that Morgan had more contact with K.G.L.'s teachers when he attended the Cypress school. K.G.L.'s grades lowered when he transferred to Carterville in the third grade, but he was currently doing pretty well. While attending the Cypress school, K.G.L.'s teacher sent Gregory and Morgan messages about K.G.L.'s behavior; he pulled a chair out from underneath another child which caused that child injury, he called a female student "fat," and he was taken out of the classroom a few times for his behavior. Although Gregory acknowledged that K.G.L.'s behavior had improved at his new school, he described K.G.L.'s previous behavioral issues as "minimal."

¶ 33    Gregory denied having any substance abuse issues, being admitted to a drug and alcohol treatment facility, and testing positive for cocaine upon being admitted to the facility. He claimed that he was admitted to the facility for treatment of posttraumatic stress disorder. He admitted that he left the facility early so that he could go on a family vacation but denied drinking to excess on that trip. He also denied that he damaged the rental house and claimed that any witnesses that said otherwise were lying. He admitted that he was arrested in August 2017 for disorderly conduct and that he was intoxicated.

¶ 34    As part of his employment, he tested for drugs and alcohol approximately once each month, and all of his tests had been negative. He did not drink to excess; he drank a couple of beers every other weekend. He also did not take drugs, except for Adderall that he was prescribed.

¶ 35    Gregory denied referring to K.G.L. as a "pussy" and as a "little fuck" in his communications with Morgan. Gregory also denied belittling K.G.L. by calling him names and criticizing him. He admitted previously calling Morgan derogatory names, such as "bitch" and "fucking stupid." Gregory regretted the language that he used toward Morgan, but it did not take away from his ability to care for the children or the love that he had for them.

13

¶ 36 Gregory eventually admitted to threatening Morgan when he was presented with a January 2019 text message conversation between them. In that conversation, Morgan texted, "He is down here crying. You think it's okay to call your son a pussy and a little fuck?" and he responded, "So you stay the fuck out of raising my boys. You let *** them walk all over you, you will cripple them for the rest of their lives. You will pay dearly for this when they are teens. Stay the fuck out of my conversation with my six-year-old, and it won't escalate like that or to that. Bitch, I won't warn you again." He indicated that there were also text message conversations where Morgan had threatened him, but he did not have those messages available because they were deleted off his phone the night before Morgan left. He also noted that Morgan stole his old cell phone before she left. He believed that the text messages that Morgan introduced as evidence were incomplete, and some had been deleted. He did not subpoena the records from his cell phone provider.

¶ 37 Gregory denied talking about the allegations in the petition for order of protection with the children. He also denied telling the children that Morgan was responsible for the breakdown of their marriage, that she was cheating on him, that Rich was not to be trusted, or that Rich was not a friend. He was indicated by DCFS for inadequate supervision because he left K.J.L. alone at home while he went hunting with K.G.L.; K.J.L. was four years old at the time. However, he explained that he was not far from the house at the time, and K.J.L. was still sleeping as it was early in the morning. He was also able to watch K.J.L. from his phone because he had a camera in the room. As soon as K.J.L. woke up, Gregory went back to the house. He denied that the camera was actually purchased after the incident; that K.J.L. had been crying because he could not find anyone in the home; and that, for a time after the incident, K.J.L. did not want to go back to Gregory's home because he was afraid of being left alone again. Although Gregory acknowledged

that K.G.L. was not wearing a helmet when he crashed his dirt bike, Gregory explained that K.G.L. knew better than to ride his dirt bike without a helmet.

¶ 38    Gregory then testified about the marital property that was subject to division.  He testified that Morgan's vehicle was a 2017 Toyota RAV4, the equity in the vehicle was $19,768 as of June 2021 (the date of separation), and the loan was paid off.  His vehicle was a 2017 GMC Sierra, and he still owed approximately $22,000 on the vehicle loan.  They also owned a 2019 Cherokee Forest River, which was a toy hauler camper, and the equity was $19,256.95 as of June 2021.  As for the Dongola property, the appraised value was $345,000, the amount remaining on the mortgage as of June 2021 was $171,721.62, and the equity was $173,278.37 as of June 2021.  However, he believed that, considering the agreement that was made with his parents, the equity was actually $90,998.38.  Since the separation, he had paid one-half of the monthly mortgage payments and the real estate taxes on the property while his parents paid the remaining one-half.

¶ 39    Chelsea Nanos, Gregory's girlfriend, testified that she observed Gregory with the children, he was a loving and good father, and he engaged in a lot of activities with them.  She did not believe that he had a substance abuse problem; she had never seen him use drugs.  She had two daughters, ages eight and four, and Gregory was very good with them.  Her children were best friends with his children.

¶ 40    Gregory Alan L., Gregory's father, testified that he and his wife had made one-half of the mortgage payments on the Dongola property for approximately 12 years.  They made those payments because they believed that they were buying one-half of the property under the oral agreement they made with Morgan and Gregory.  The agreement was that, after the property was surveyed, Gregory and Morgan would transfer one-half of the property to him and his wife.  It was his intention to remodel the farmhouse located on the property for him and his wife and then to

15

build a home on the property for Gregory and Morgan. He estimated that they had paid $75,000 toward the property. He claimed that the money was not a gift to the marital estate, and he expected to be reimbursed if he did not receive one-half of the property.

¶ 41    Gregory Alan acknowledged that he owned a construction business, and he had previously built two homes for his daughter at a reduced hourly labor rate (an almost 50% reduction). When his daughter sold the first home, he did not receive any of the sale proceeds. He was also in the process of building a home for Gregory's brother and was charging the same labor cost. He acknowledged that it was fair to say that he made either a labor or financial contribution toward the construction of all of his children's homes. Although he indicated that he did not expect his other two children to pay him any portion of the equity that they received from selling the homes that he built, he expected Gregory to reimburse him for the full amount that he put into Gregory's home.

¶ 42    After the trial court heard all of the testimony, the court indicated that it needed further information regarding the valuation of certain marital assets before it could make an appropriate ruling on the distribution of marital property. Specifically, the court requested evidence showing the payoff amount on the Dongola mortgage as of the date of the hearing as well as the date of separation, the payoff amount of any of the vehicle loans as of the date of the hearing and the date of separation, and a valuation of the vehicles, which included the toy hauler.

¶ 43    The trial court then announced that it was awarding Morgan sole decision-making authority over the children. In making this decision, the court indicated that the testimony and evidence made it very clear that Morgan was the primary caretaker of the minor children throughout the marriage and that she took care of their educational, medical, and other needs. The court also

16

indicated that the children had been attending school in Carterville for approximately two years, and, although there had been some issues initially, they were now stable in that environment.

¶ 44    The trial court found that each party's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the children had been sorely lacking.  The court noted that the parties had to utilize the Our Family Wizard program to communicate with each other, and that, even using that program, there were communications that were inappropriate and not related to the children.  The court indicated that there were significant challenges with the parents being able to coparent and get along with each other.  The court noted that there were inappropriate comments being made to the children about the proceedings, there had been name-calling and derogatory comments made in the children's presence, and there was testimony of prior physical violence and threats of violence between the parties.  The court also noted that there had been an order of protection entered between the parties, and the children had been part of DCFS investigations.

¶ 45    The trial court believed that there had been emotional manipulation of the children and addressed Gregory about his behavior.  The court indicated that it believed that Gregory had a problem with women and that there was ample evidence about how he had been disrespectful toward Morgan, sometimes in the presence of the children.  The court cautioned him that he was teaching his male children that women should be treated in that way and that was why his children had issues with female teachers.  The court then found that, given the relationship between the parties, it did not believe that joint decision-making could be accomplished to benefit the children and that it would instead cause further arguments where the children would be placed in the middle. Thus, the court awarded Morgan sole decision-making authority.  The court then took the remaining issues under advisement.

17

¶ 46    On April 13, 2023, the trial court entered a judgment dissolving the parties' marriage.  In the judgment, the court awarded the Dongola property to Gregory, allocated the mortgage debt to him, and ordered him to pay one-half of the equity in the property, totaling $81,788.74, to Morgan. As for the payments made by his parents toward the property, the court noted that Gregory requested that the payments be considered either a debt owed by the parties or a contribution claim attributable to his parents.  However, the court noted that there was no writing evidencing any agreement for reimbursement or repayment of these monies, and there had been no payments made to Gregory's parents during the parties' marriage that would demonstrate a repayment plan.  Thus, the court denied the request for contribution and concluded that the payments were a gift to the parties and that the gift was similar to Gregory's father building residences for his other children at reduced costs for which he never asked for reimbursement when those houses were sold.  The court indicated that, if Gregory believed that any debt remained outstanding to his parents for their payments on the marital residence, he was solely responsible for repaying that debt.

¶ 47    The trial court also indicated that the parties had not reached an agreement as to the valuation of the toy hauler or the RAV4 or an agreement as to the division of equity in those vehicles.  The court then noted that it could not determine which valuation provided by the parties was correct without further inquiry, so it averaged the values provided to determine the value of each asset.  Thus, the court determined that the value of the RAV4 was $18,842.50, which was awarded to Morgan.  The court determined the value of the toy hauler was $33,625 and awarded Gregory the toy hauler and the GMC Sierra (the agreed value of the equity was $3500).  The court ordered Gregory to pay Morgan $18,282.50, so that there was an equitable division of the values of these vehicles.

18

¶ 48   That same day, the trial court also entered a parenting plan and judgment, allocating the parties shared decision-making authority regarding caretaking functions during their respective parenting times and allocating Morgan significant decision-making authority regarding decisions related to the children's education, health, extracurricular activities, and religion. The court also allocated Morgan the majority of the parenting time and established a parenting time schedule. Gregory appeals.

¶ 49                              II. ANALYSIS

¶ 50        A. Allocation of Parental Decision-Making Authority and Parenting Time

¶ 51   Gregory contends that the trial court's allocations of decision-making authority and parenting time were against the manifest weight of the evidence. Specifically, he argues that the evidence was uncontroverted that he loved the children and spent a lot of time engaging in activities with them, he provided for their needs when they were in his care, Morgan constantly interfered with his relationship with them, and there was no reason why the court should have allocated all significant decision-making responsibilities to her.

¶ 52   Under section 602.5(a) of the Illinois Marriage and Dissolution of Marriage Act (Act), the trial court must allocate parental decision-making responsibilities according to the child's best interests. 750 ILCS 5/602.5(a) (West 2022). In determining the child's best interests for allocation of decision-making responsibilities, the court must consider all relevant factors, including: (1) the child's wishes; (2) the child's adjustment to his or her home, school, and community; (3) the mental and physical health of all individuals involved; (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making; (5) the level of each parent's participation in past significant decision-making with respect to the child; (6) any prior agreement or course of conduct between the parents relating

19

to decision-making with respect to the child; (7) the parents' wishes; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on decision-making is appropriate; (11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (12) the physical violence or threat of physical violence by the child's parent directed against the child; (13) the occurrence of abuse against the child or other member of the child's household; (14) whether one of the parents is a sex offender; and (15) any other factor that the court expressly finds to be relevant. *Id*. § 602.5(c).

¶ 53    Section 602.7(a) of the Act also instructs that the trial court must allocate parenting time according to the child's best interests. *Id*. § 602.7(a). In arriving at that decision, the court must consider all relevant factors, including: (1) the wishes of each parent seeking parenting time; (2) the child's wishes; (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under two years of age, since the child's birth; (4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child; (5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests; (6) the child's adjustment to his or her home, school, and community; (7) the mental and physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the physical violence or threat of physical violence by the child's parent

20

directed against the child or other member of the child's household; (12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs; (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other member of the child's household; (15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender; (16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and (17) any other factor that the court expressly finds to be relevant. *Id.* § 602.7(b).

¶ 54    The trial court's best-interest determinations are entitled to great deference because the court is in the superior position to observe the proceedings and assess the credibility of the witnesses. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21. A trial court's determination regarding a child's best interests will not be reversed on appeal unless the decision is against the manifest weight of the evidence, and it appears that a manifest injustice has occurred. *In re Parentage of P.D.*, 2017 IL App (2d) 170355, ¶ 18. A decision is against the manifest weight of the evidence when the opposite result is clearly evident from the record. *In re Marriage of Betsy M.*, 2015 IL App (1st) 151358, ¶ 61.

¶ 55    Here, although the trial court acknowledged that Gregory loved the children, the court determined that it was in their best interests for Morgan to have significant decision-making authority and the majority of the parenting time. In making these best-interest determinations, the court noted that Morgan was the primary caretaker of the children during the marriage; the children had been attending Carterville school for about two years and were stable in that environment; each party's willingness to facilitate and encourage a close and continuing relationship with the

21

other parent and children was sorely lacking; and there had been testimony presented of prior physical violence or threats of violence, inappropriate communications between the parties, and the parties' challenges with coparenting.

¶ 56    The trial court also addressed Gregory about the derogatory comments that he made to and about Morgan, sometimes in the presence of the children, and how that impacted the children and shaped their behavior toward women. After carefully and thoughtfully considering the relevant best-interests factors, the court found that the previous relationship between the parties did not support joint decision-making and allocated Morgan the majority of the parenting time. Based upon the record before us, we conclude that the trial court's determinations regarding the children's best interests were not against the manifest weight of the evidence.

¶ 57                          B. Valuation of Marital Property

¶ 58    Gregory next contends that, in valuing the vehicles, the trial court failed to consider the money that he paid on the vehicle loans after the parties separated. Specifically, Gregory argues that he paid a total of $6000 on the debt secured by the toy hauler after the separation, and he should be given credit for this payment.

¶ 59    A trial court has broad discretion in the division of marital assets, and we reverse its determinations only if it is clear that the trial court has abused that discretion. *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 161 (2005). A trial court abuses its discretion when no reasonable person would take the view adopted by the court. *Id.*

¶ 60    Section 503 of the Act requires the trial court to make specific factual findings as to the value of the marital property. 750 ILCS 5/503(a), (k) (West 2022). A court's determination of the value of marital assets in a division-of-property proceeding will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Vancura*, 356 Ill. App. 3d 200,

22

203 (2005). A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *In re Marriage of McBride*, 2013 IL App (1st) 112255, ¶ 24.

¶ 61    Here, in determining the value of the relevant vehicles, the trial court noted that the parties could not reach an agreement regarding the value of the RAV4 and the toy hauler; the parties had agreed on the $3500 valuation of the equity regarding the GMC Sierra. Because it could not determine which valuation was correct based on the evidence presented by the parties, it averaged the different values to determine the value of each vehicle. It, thus, valued the RAV4 at $18,842.50 and the toy hauler at $33,625. The court then awarded the RAV4 to Morgan and the GMC Sierra and the toy hauler to Gregory. To ensure an equitable distribution of these assets, the court ordered Gregory to pay Morgan $18,282.50. Gregory has not pointed to anything in the record that indicates that these valuations are against the manifest weight of the evidence or that the distribution of the assets was an abuse of discretion. As for the $6000 loan payments, there is no indication in the record that the court did not consider those payments when it averaged the two valuations provided by the parties, instead of accepting the higher valuation provided by Morgan.

¶ 62                              C. Property Classification

¶ 63    Lastly, Gregory contends that the trial court's classification of the money that was paid by his parents toward the marital home as a gift to the parties was against the manifest weight of the evidence. Specifically, he argues that the uncontroverted testimony indicated that, during the marriage, he and Morgan entered into an oral agreement with his parents that his parents would pay one-half toward the mortgage, taxes, and insurance on the property, and in exchange, they would transfer one-half of the property to his parents. He contends that his father's testimony showed that this was not a gift, and his father expected it to be repaid if the property transfer did

23

not occur. Gregory also contends that the court's decision requiring him to pay one-half of the daycare expenses that were incurred to Robins Nest daycare was against the manifest weight of the evidence.

¶ 64 Before a trial court may dispose of property upon a dissolution of marriage, it must classify the property as either marital or nonmarital property, and the court's classification will not be disturbed unless it is contrary to the manifest weight of the evidence. *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186 (1992). Debt is a type of property for the purposes of the Act. 750 ILCS 5/503(a) (West 2022). Marital debts as well as marital assets must be distributed equitably. *In re Marriage of Lees*, 224 Ill. App. 3d 691, 693 (1992).

¶ 65 However, in this case, the trial court found that the money paid by Gregory's parents toward the marital property was not marital debt and was instead a gift to the parties. In making this decision, the court noted that there was no written documentation to establish that this was a loan; there was no written agreement setting out the terms of the agreement or showing that the money must be repaid. The court also noted that the parties had not made any payments to Gregory's parents during the marriage, which further supported the conclusion that these payments were a gift. Although Gregory's father testified that these payments were not a gift to the parties, the court found that the payments were similar to Gregory's father building residences for his other children at a reduced cost for which he never asked for reimbursement after the houses were sold. In general, the reviewing court should not second-guess the trial court's factual findings when those findings are based on the trial court's assessment of the credibility of witnesses and the weight given to their testimony. *In re Marriage of Awan*, 388 Ill. App. 3d 204, 213 (2009). As the court's classification of this money as a gift rather than a loan was based on its assessment of the witness's credibility, and there was no documentation presented to establish that Gregory's

24

parents intended the money to be a loan to the parties, we find that the court's decision was not against the manifest weight of the evidence.

¶ 66    As for the allocation of the daycare expense debt, Morgan testified that she had paid approximately $12,000 toward daycare expenses for the summer of 2022. She explained that she was charged the entire amount for June, July, and August, even though Gregory had the children for one-half of the summer, because Gregory did not let her know in time that he was exercising his summer parenting time. She testified that, although she had repeatedly asked him what his plans were for the summer, he did not respond until the week before school let out. She then explained that she had to pay the full amount for the daycare expenses because the daycare indicated that it was too late to switch to part-time, and she noted that it was too late to find different daycare. In ordering that the parties were equally responsible for the daycare expenses when the children were not in attendance, the trial court noted that those expenses were incurred because Gregory failed to timely notify Morgan that he was taking the children for one-half of the summer. Based on the testimony presented, we find that this decision was supported by the evidence.

¶ 67    Finally, we pause to note that there were several scrivener's errors in the April 13, 2023, judgment of dissolution of marriage which require correction, as they may be relevant in future proceedings. First, in paragraph B of the judgment, the record reveals that the place of marriage was Jackson County, not Williamson County. Therefore, we amend the judgment to reflect that the marriage of the parties was "recorded in Jackson County, Illinois." Next, in paragraph 2, under the heading, "Dongola Real Estate," the date of separation was "approximately 6/12/2021," not 6/12/2001. The judgment is hereby amended to reflect the "approximate date of separation of 6/12/2021." Lastly, we note that the parenting plan and judgment reflects that K.G.L. was born January 22, 2012. However, in paragraph D of the judgment of dissolution of marriage, K.G.L.'s

25

birthdate is identified as January 22, 2013. The record supports a finding that K.G.L. was born January 22, 2013, and the parenting plan and judgment entered April 13, 2023, is amended to identify the proper birth date for K.G.L. In all other respects, the judgment is affirmed.

¶ 68                             III. CONCLUSION

¶ 69      For the foregoing reasons, the judgment of the circuit court of Williamson County is hereby affirmed as modified.

¶ 70      Affirmed as modified.